UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIENT OVERSEAS CONTAINER LINE LTD.,

              Plaintiff,

     v.

CRYSTAL COVE SEAFOOD CORP.,

              Defendant.

ECF CASE

MEMORANDUM
OPINION & ORDER

10 Civ. 3166 (PGG)

PAUL G. GARDEPHE, U.S.D.J.

        Plaintiff Orient Overseas Container Line Ltd. ("Orient") is a commercial carrier that contracted with Defendant Crystal Cove Seafood Corp. ("Crystal") to transport frozen tilapia from Shekou, China to Smyrna, Tennessee.  (Cmplt. ¶ 7)  The Complaint alleges that Crystal breached the terms of a bill of lading contract by refusing to take delivery of the cargo, and seeks $49,364.20 in demurrage, transportation, and surveying expenses that Orient incurred as a result of Crystal's alleged misconduct.  (Id. ¶¶ 8, 12-16, 18, 20)  In a counterclaim, Crystal contends that as a result of Orient's alleged breach of its duties under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701 et seq., Crystal incurred damages of $67,490.00.  (Amended Answer, ¶¶ 20-26)

        Crystal now moves for summary judgment on its counterclaim and for an order dismissing Orient's claim.  For the reasons stated below, Crystal's motion for summary judgment will be DENIED.

## BACKGROUND

        Orient contracted with Crystal to transport 3,400 cartons of frozen tilapia fillets from China to Tennessee.  The bill of lading provides for the cargo to be loaded at Shekou,

China, transported to the port of Long Beach in California, and ultimately delivered in Smyrna, Tennessee. (Def. R. 56.1 Stmt. ¶¶ 1-3; DeGrand Decl., Ex. A (Bill of Lading))[1] United States Cold Storage ("USCS") in Smyrna, Tennessee was designated as the facility to receive the cargo. (Id. ¶ 80)

In China, the tilapia was washed, inspected, and then flash-frozen. (Def. R. 56.1 Stmt. ¶¶ 6, 10-20) The flash-freezing process ensures that the tilapia is frozen as individual fillets, making it easier for the purchaser to use. (Id. ¶¶ 13-14) The cargo was loaded into a 40-foot refrigerated container on July 6, 2009. (Id. ¶¶ 25-26, 30) It is undisputed that when Orient took custody of the tilapia, the fish was in good condition. (Id. ¶ 31)

The bill of lading specifies that the tilapia is to be shipped at -18.0 Celsius (-0.4 degrees Farenheit). (Id. ¶ 1; DeGrand Decl., Ex. A (Bill of Lading)) It is undisputed that when the cargo was loaded into the container, the refrigeration unit was functioning properly and was set at -18.0 Celsius (-0.4 degrees Farenheit). (Id. ¶ 28)

On or about July 30, 2009, during transit, the refrigeration unit in the container failed. (Id. ¶ 33) Orient learned on August 1, 2009, that the refrigeration unit had malfunctioned (id.) but did not notify Crystal of the malfunction until August 3, 2009. (Id. ¶¶ 77, 78) A mechanic determined that the "relay board and wiring in the container's [refrigeration] unit was burnt out." (Ng Decl., ¶ 29, Ex. 8)

---

[1] To the extent that this Court relies on facts drawn from Defendant's Local Rule 56.1 Statement, it has done so because Plaintiff has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where Plaintiff disagrees with Defendant's characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

The temperature data recorder log for the container shows that the temperature inside the container began rising dramatically on the morning of July 30, 2009,. (DeGrand Decl., Ex. C) The log shows that between August 2, 2009 and August 4, 2009, the temperature inside the container ranged from 4.5 degrees Celsius (40.1 degrees Farenheit) to 10 degrees Celsius (50 degrees Farenheit). (Def. R. 56.1 Stmt. ¶ 132) When the cargo arrived for delivery at USCS in Smyrna on August 4, 2009, the fish smelled and the temperature inside the container was 29.8 to 30.3 degrees. USCS refused to accept the container, and expressed concern that "the odor from the product may contaminate the warehouse." [2] (Def. R. 56.1 Stmt. ¶¶ 98-100; DeGrand Decl., Ex. G)

The temperature data recorder log for the container ends at 9:00 a.m. on August 4, 2009. The last temperature reading was 7.5 degrees Celsius or 45.5 degrees Farenheit. (Def. R. 56.1. Stmt. ¶¶ 128-30) The tilapia remained inside the container with the malfunctioning refrigeration unit until August 6, 2009, when it was transloaded into another container. (Id. ¶¶ 106, 133; Davies Decl., Ex. 1, Ex. 3) On August 7, 2009, Orient again attempted to make delivery at USCS, but the cargo was again rejected. (Greer Decl. ¶ 9)

On August 18, 2009, representatives of Plaintiff, Defendant, and USCS conducted a joint survey of the cargo. (Def. R. 56.1 Stmt. ¶ 34; Davies Decl., Ex. 1, Ex. 3) Orient's surveyor issued a report stating that he had "randomly selected cartons of fish to open for inspection" and "[i]n all instances . . . found varying degrees of freezer burn on the fish. . . . [He] also noted clumping of the fish and in numerous instances discoloration." (Davies Decl., Ex. 1)

---

[2] Orient argues that USCS's telefax to Crystal relaying this information does not indicate whether the reading was in Celsius or Farenheit. (Pltf. R. 56.1 Resp. ¶ 99) All temperature readings presented by the parties were taken in Celsius, however, see, e.g., DeGrand Decl., Ex. C, and given the odor emitted by the fish, it is a fair inference that the reading was in Celsius rather than Farenheit.

The surveyors began their inspection at the rear of the container but then "progressed further into [it] and continued to randomly inspect cartons. [Their] findings noted the same conditions as previously sighted." Orient's surveyor went on to state that "the damages sighted appear to be the result of the refrigerated container malfunctioning." (Id.)

> Crystal's surveyor issued a report that made similar findings:
>
> the individually frozen Tilapia fillets had obviously thawed at some point in the past and completely refroze together in solid 10-pound blocks. In addition to that, all the Talapia fillets . . . exhibited extensive ice crystals. There was extensive discoloration and obvious freezer burn on most of the fillets observed. . . . After allowing a few selected fillets to thaw gradually and partially, they began to exude a very offensive "fishy" odor. . . .The entire shipment was involved. A good representative sample was surveyed, and adverse conditions were found throughout the container.

(Davies Decl., Ex. 3) Crystal's surveyor concluded that the fish "is not usable as a prime food source" and that it had "no salvage recovery potential." (Id.)

From August 4, 2009, to March 19, 2010, the cargo was stored in an Orient container in Memphis, Tennessee. (Ng Decl., ¶ 19) During this time, the parties argued over who was responsible for the damage to the cargo and what should be done with it. (Ng Decl., Ex. 11,12) Orient seeks container demurrage fees for this period of time. (Cmplt., ¶¶ 13-16) In March 2010, after giving notice to Crystal, Orient sold the cargo for $30,610.00. (Cmplt. ¶ 18; Ng Decl., ¶ 69, Ex. 13)

## DISCUSSION

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "'[W]here the nonmoving party

4

will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

I.  **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM**

The parties agree that Crystal's counterclaim is governed by COGSA, 46 U.S.C. § 30701 et seq.[3]  See (Pltf. Br. 5; Def. Br. 2)  Because there is a material issue of fact as to whether Orient acted with "due diligence to avoid and prevent the harm" to the cargo, see Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 429 (2d Cir.1962),  Crystal's motion for summary judgment on its counterclaim will be denied.

---

[3] COGSA was previously codified at 46 U.S.C. §§ 1300-1315.  When Congress recodified Title 46 in 2006, COGSA was not included in the recodification, but rather was reprinted as a statutory note following the first section of 46 U.S.C. § 30701.  Therefore, the source of its authority remains the original enactment.  See David W. Robertson & Michael F. Sturley, Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits, 32 TUL. MAR. L.J. 493, 500 (2008).

5

A. **Applicability of COGSA**

COGSA governs all contracts "for the carriage of goods by sea to or from ports of the United States, in foreign trade." 46 U.S.C. § 30701 note. COGSA imposes on ocean carriers a duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." COGSA § 3(2). The statute applies "from the time when the goods are loaded on to the time when they are discharged from the ship," id. at § 1(e), but the parties may extend its application by contract to cover "the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea." Id. at § 7; American Home Assur. Co. v. Panalpina Inc., No. 07 Civ. 10947 (BSJ), 2011 WL 666388, at *3 (S.D.N.Y., February 16, 2011) (citing Hartford Fire Ins. Co. v. Orient Overseas Containers Lines, Ltd., 230 F.3d 549, 557 (2d Cir. 2000)).

Here, COGSA was expressly incorporated into the bill of lading and was extended to govern "throughout the carriage by sea and the entire time that the Goods are in the actual custody of the Carrier or its sub contractor . . . or after discharge therefrom as the case may be." (Davies Decl., Ex 19 ("Terms and Conditions of the OOCL bill of lading" at paragraph D))

B. **Crystal's Prima Facie Case**

In order to recover against a carrier for damage to goods shipped pursuant to a bill of lading governed by COGSA, a shipper "'bears the initial burden of proving both delivery of goods to the carrier . . . in good condition, and outturn by the carrier . . . in damaged condition.'" Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration, 137 F.3d 94, 98 (2d Cir.1998) (quoting Vana Trading Co v. S.S. "Mette Skou", 556 F.2d 100, 104 (2d Cir. 1977)). The Second Circuit has held that "the issuance of a clean bill of lading creates a presumption of

delivery in good condition favorable to the plaintiff." Id. The "plaintiff [still] has the burden, [however,] of proving that 'the goods were damaged while in the carrier's custody.'" Caemint Food, Inc. v. Brasileiro, 647 F.2d 347, 351-52 (2d Cir. 1981) (quoting Pan-American Hide Co. v. Nippon Yusen (Kabushiki) Kaisha, 13 F.2d 871, 871 (S.D.N.Y. 1921) (L.Hand, J.)).

A shipper can establish a prima facie case for liability under COGSA by: (1) "present[ing] direct evidence relating to the healthy condition of the goods at delivery and their damaged condition at outturn," Transatlantic Marine Claims Agency, Inc., 137 F.3d at 98; or (2) demonstrating "from the condition of the cargo as delivered or otherwise, that the damage was caused by the carrier's negligence and not by any inherent vice in the cargo." Vana Trading, 556 F.2d at 105 n.8 (citing Elia Salzman Tobacco Co. v. S.S. Mormacwind, 371 F.2d 537, 539 (2d Cir. 1967)).

Here, Orient concedes that the cargo was "in good order and condition [when] . . . received by [Orient]," and further "concedes that some of Crystal['s] cargo was damaged before [Orient] delivered the cargo."[4] (Pltf. Br. 6) Accordingly, there is no dispute that Crystal has established a prima facie case.

### C. Rebuttal of Prima Facie Case

Once a shipper makes out a prima facie case under COGSA, the burden shifts to the carrier, who may rebut the prima facie case by showing that one of the statutory exceptions to liability set forth in section four exists, American Home Assur. Co. v. Zim Jamaica, 418 F.Supp.2d 537, 545 (S.D.N.Y. 2006) [hereinafter Zim Jamaica II] (citing Atl. Mut. Ins. Co. v.

---

[4] While Orient argues that Crystal has not "prove[n] the extent of the damage to the cargo at the time of delivery" (Pltf. Br. 6), the question of when exactly the fish was ruined, or the precise moment that the container's refrigeration unit malfunctioned, is immaterial to whether Crystal has established a prima facie case. See American Home Assur. Co. v. Zim Jamaica, 296 F.Supp.2d 494, 499-500 (S.D.N.Y., 2003) [hereinafter Zim Jamaica I] (citing Transatlantic, 137 F.3d at 101-02).

7

CSX Lines, L.L.C., 432 F.3d 428,433 (2d Cir 2005)), or by proving that "it exercised due diligence to avoid and prevent the harm." Id. (citing Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 429 (2d Cir.1962) (Friendly, J)); see also Marine Office of America Corp. v. Lilac Marine Corp., 296 F.Supp.2d 91, 102 (D.P.R. 2003). Orient does not claim that any of the enumerated statutory exceptions to liability apply, but argues that there is a material issue of fact as to whether "it exercised due diligence to avoid and prevent the harm." Zim Jamaica II, 418 F.Supp.2d at 545. (Pltf. Br. 6)

COGSA requires a carrier to use due diligence to "make the ship seaworthy at the beginning the voyage"; "to properly man, equip, and supply the ship"; and to "make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation." §§ 3(1)(a) - (c). Thus, "[t]he use of defective or inadequate equipment or gear not reasonably suited for the purposes for which it is used may render a vessel unseaworthy." Kentucky Fried Chicken Int'l Corp., v. S/S Ponce, et al., 1988 U.S. Dist. LEXIS 3225 at *13-14 (E.D. La. April 13, 1988) (citing Martinez v. Dixie Carriers Inc., 529 F.2d 457, 467 (5th Cir. 1976)).

"'[T]he issue [of due diligence] is always a factual one, the determination of which is unique to each case.'" Chiquita Intern., Ltd. v. MV Canis J, No. 00 Civ. 2257(AGS), 2001 WL 986717 at *2 (S.D.N.Y.2001) (citing Holsatia Shipping Corp. v. Fidelity and Cas. Co., 535, F.Supp. 139, 145 (S.D.N.Y.1982)). Due diligence is measured by "whatever a reasonably competent vessel owner would do under the circumstances." Complaint of Tecomar, S.A., 765 F.Supp. 1150, 1179 (S.D.N.Y. 1991). A visual inspection may – depending on the nature of the defect or loss – be sufficient to demonstrate due diligence. Margarine Verkaufsunion G.m.B.H. v. M.T.G.C. Brovig, 318 F.Supp. 977, 981 (S.D.N.Y. 1970) (Weinfeld, J.) (due diligence

established where surveyor performed pre-trip inspection, including visual examination); see also Steel Coils, Inc. v. M/V Lake Marion, 331 F.3d 422, 431 (5th Cir. 2003) (carrier failed to exercise due diligence where hatches were not maintained in good condition and had not been tested for water tightness before embarkation).

Here, Orient has submitted a declaration from Eric Anderson, a senior operations specialist at Orient who "work[s] daily on the maintenance and repair of [Orient] containers." (Anderson Decl., ¶ 1)  Anderson notes that the container at issue was put into service in 2008; and accordingly had only been in service for about one year when it malfunctioned.  Containers of this sort are expected to have a useful life of approximately 12 to 15 years.  (Id. ¶¶ 7, 16)  A pre-trip inspection of the container was conducted on June 26, 2009, and the container and its refrigeration unit were found to be in good condition.  (Id. ¶ 11)  Anderson further affirms that the relay board and wiring that later malfunctioned were "checked as part of the [pre-trip inspection]" and that no visual damage was noted.  (Id. ¶ 12)  Anderson notes that the relay board and wiring do not have parts that show wear or that require regular maintenance, and "[n]o one expected a problem with the relay board and wiring given the age of the container at the time of the malfunction."  (Id. ¶¶ 13, 18).

On the current record, this Court cannot rule as a matter of law that Orient did not exercise due diligence in connection with the malfunctioning refrigeration unit.[5]  Accordingly, Crystal's motion for summary judgment on its counterclaim will be denied.[6]

---

[5] To the extent that Crystal claims that Orient was negligent once the malfunction in the refrigeration unit was discovered, there are issues of fact that preclude a grant of summary judgment. In particular, in order to determine whether Orient was negligent during the August 4 to August 6, 2009 time period, one must understand what obligations Orient owed Crystal once USCS refused to accept delivery of the cargo.  As discussed below, the contractual terms delineating the parties' obligations in such circumstances are not sufficiently clear to permit the Court to rule as a matter of law on the parties' claims.

9

## II. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS

Crystal seeks summary judgment on Orient's claim for container demurrage, and transportation and surveying expenses. Crystal argues that Orient is responsible for these expenses, because they were incurred as a result of Orient's negligence in transporting the cargo and in delivering it in a compromised condition.

Determination of this issue turns on the bill of lading and the associated tariff. Because the language of these documents does not unambiguously address the unusual circumstances of this case, Crystal's motion for summary judgment on Orient's claims will be denied.

### A. Applicable Law

A "shipping contract consists of the bill of lading and the applicable tariffs lawfully published and filed." Missouri Pac. R. Co. v. Elmore and Stahl, 377 U.S. 134, 144 (1964). These documents set out the terms which bind the parties and govern the transaction. "'[B]ills of lading are contracts of adhesion and, as such, are strictly construed against the carrier.'" GSI Gr.p, Inc. v. Zim Integrated Shipping Services, Ltd., 562 F.Supp.2d 503, 506 (S.D.N.Y. 2008) (quoting Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro, 775 F.2d 476, 486 (2d Cir. 1985)).

---

[6] To the extent that Crystal argues that it is entitled to summary judgment on its counterclaim based on a bailment and conversion theory, any such claim is preempted by COGSA. See Polo Ralph Lauren, L.P. v. Tropical Shipping & Const. Co., Ltd., 215 F.3d 1217, 1220-1221 (11th Cir. 2000) ("We have found no cases in which a court has allowed a tort claim to proceed when COGSA applies"); National Automotive Publications, Inc. v. U.S. Lines, Inc., 486 F.Supp. 1094,1099 (S.D.N.Y. 1980) ("plaintiff cannot avoid application of [COGSA's] substantive provisions by couching the instant claims in terms of negligence, breach of contract and the wrongful detention of goods.").

Although the interpretation of a maritime contract is governed by federal common law, see Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 22-23 (2004), "'[i]n developing federal common law in an area, [a court] may look to state law.'" American Home Assurance Co. v. Hapag Lloyd Container Linie, GmBH, 446 F.3d 313, 316 (2d Cir. 2006) (quoting Critchlow v. First UNUM Life Ins. Co. of America., 378 F.3d 246, 256 (2d Cir.2004)).  Where the proper interpretation of a contract is at issue, "a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning." Id. (quoting Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir.1993)).  In reviewing competing interpretations of a contract's language, the court "need not determine which is the more likely interpretation, but rather . . . merely decide whether [each] . . . is sufficiently reasonable to render the clause ambiguous." GSI Grp., Inc., 562 F.Supp. 2d at 507 (internal citations omitted).  Contract language is considered ambiguous if it is "'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Hapag Lloyd, 446 F.3d at 316 (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir.1997)).

      B.    <u>Analysis</u>

Here, the bill of lading and accompanying explanatory documents (Ng Decl., Ex. 2, 3, 4; Davies Decl., Ex. 19) are ambiguous as to whether Orient has a right to the expenses it seeks.  The bill of lading terms refer the reader to the tariff in order to determine whether "free

11

time" has expired.[7]  The tariff provides that free time has not expired where the carrier is unable to tender the cargo for delivery.  These documents do not define "delivery" nor do they address the circumstances here – attempted delivery of damaged cargo – other than to say that the carrier's liability for damages is governed by COGSA.  (Davies Decl., Ex.19, clause D)

Orient relies on the following language in the bill of lading terms for its claim that the cargo must be deemed delivered, even though it was damaged and denied entry by warehouse personnel:

> [i]f the Merchant fails to take delivery of the Goods or part of them upon expiration of the tariff's prescribed free time, the Goods shall be deemed to have been delivered to the Merchant and the Carrier may with or without notice, but subject to its lien, unpack the Goods if packed in Container and/or store or warehouse the Goods or any part thereof ashore, afloat, in the open or under cover at the sole risk and expense of the Merchant.  Thereupon, the liability of the Carrier in respect of the goods shall cease wholly and the costs of such storage (if paid or payable by the Carrier or any agent or sub-contractor of the Carrier) shall forthwith upon demand be paid by the Merchant to the Carrier.

(Ng Decl., Ex. 2)(emphasis added).  Whether the refusal of USCS to take delivery – under the circumstances – constitutes a refusal by Crystal to take delivery cannot be resolved as a matter of law.

Crystal argues that Orient is not entitled to the costs of storage because it was not able to "tender cargo" due to the poor condition of the tilapia.  Section Four of the tariff states in relevant part:

> Carrier Inability- USA
> "When the carrier is for any reason unable to tender cargo for delivery during free time, free time will be extended for a period equal to the duration of the carrier's inability to tender the cargo.  If such condition arises after the

---

[7] "Free time" is the period during which a carrier may not charge its customer demurrage fees, even though the customer's cargo remains inside the carrier's vessel or container.  See J. Kinderman & Sons v. Nippon Yusen Kaisha Lines, 322 F.Supp. 939, 942 (E.D.Pa.1971) ("'[f]ree time' is merely the period of time during which a consignee can allow his goods to remain on a pier before it must start paying additional charges")

      expiration of free time, no demurrage or first period demurrage will be charged for a period equal to the duration of the carrier's inability to tender the cargo."

(Ng Decl. Ex.4 "Tariffs and Rates" p.8) (emphasis added). It is not clear whether Orient's attempted delivery of the compromised cargo constitutes an inability to tender cargo for purposes of the tariff.

      Similarly, while the tariff provides that the "Carrier's responsibility shall cease upon delivery of the container to the initial [Store Door Delivery] Destination and the Carrier shall have no further obligation with regard to the cargo" (Ng Decl., Ex. 3), given that the cargo was never accepted by USCS, it is not clear whether there was delivery, and whether free time expired. It is likewise unclear under the bill of lading and accompanying tariffs whether Crystal remains responsible for the cargo once it was rejected by USCS.

      The parties also dispute whether demurrage is recoverable under the bill of lading. The bill of lading terms state that after delivery the "costs of storage (if paid or payable by the Carrier or any agent or sub-contractor of the Carrier) shall forthwith upon demand be paid by the Merchant to the Carrier." (Ng Decl., Ex. 2) It is not clear whether this language only covers out-of-pocket expense or extends to demurrage.

      Because the meaning of the bill of lading, its terms, and the applicable tariffs are "capable of more than one meaning," and their application cannot be resolved as a matter of law, Crystal's motion for summary judgment on Orient's claims will be denied.

### III. DEFENDANT HAS NOT DEMONSTRATED A RIGHT TO SANCTIONS BASED ON SPOLIATION

      As discussed above, the temperature data recorder log for the malfunctioning container has no entries for the period between 9:00 a.m. on August 4, 2009 and August 6, 2009. (Def. R. 56.1 Stmt. ¶¶ 128, 133; DeGrand Decl., Ex.C) This corresponds with the period of

13

time that the cargo sat in the original container in Tennessee before being transferred to a working container.  At his deposition, Richard Ng, Orient's claims manager, admitted that "[t]he data log was corrupted" and that – as a result – "we do not have accurate records of the temperature within this container [during the period between August 4, 2009 and August 6, 2009]."  (Glynn Decl., Ex. C (Ng Dep.) at 85-86)  Ng also testified that he did not know how the data recorder had been corrupted.  (Id.)  Crystal argues that Orient's claims should be dismissed as a sanction for spoliation of evidence.

"Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"  Pension Committee of University of Montreal Pension Plan v. Banc of America Securities LLC, 685 F.Supp.2d 456, 465 (S.D.N.Y. 2010).  "'The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.'"  Fujitsu Ltd. v. Federal Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001).

Where a party seeks sanctions based on the spoliation of evidence, it must establish:

> that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002).  Dismissal is the most severe sanction, and is therefore "justified in only the most egregious cases." Pension Plan v. Banc of America Sec., 685 F.Supp.2d 456, 469-470 (S.D.N.Y. 2010).  Because dismissal is a "drastic remedy," it "should be imposed only in extreme circumstances, usually after

consideration of alternative, less drastic sanctions." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779-780 (2d. Cir. 1999) (quoting John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir.1988)).

On the current record, this Court cannot determine whether any type of sanction is appropriate. There is no evidence that Orient destroyed data. Instead, it is possible that the temperature data recorder stopped functioning five days after the refrigeration unit as a whole began to malfunction. Whether the malfunction of the temperature data recorder is related or unrelated to the failure of the refrigeration unit as a whole is unknown.

It is not obvious to this Court what Orient would gain by tampering with the temperature data recorder on August 4. Records were already extant for the period between July 30 and August 4, 2009, demonstrating that the refrigeration unit was not functioning properly, and that the temperature inside the container was much higher than the bill of lading required. See DeGrand Decl., Ex. C.

Crystal's motion for sanctions based on spoliation will be denied without prejudice to renewal based on a more complete record.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 18). The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. Trial will commence on November 7, 2011, at 9:00 a.m. Motions in limine, requested voir dire, and requests to charge are due on October 26, 2011. Responsive papers, if any, are due on November 1, 2011.

Dated: New York, New York
      September 26, 2011

SO ORDERED:

_____
Paul G. Gardephe
United States District Judge