UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIENT OVERSEAS CONTAINER LINE LTD.,

                            Plaintiff,

            v.

CRYSTAL COVE SEAFOOD CORP.,

                            Defendant.

**ECF CASE**

**MEMORANDUM
OPINION & ORDER**

10 Civ. 3166 (PGG)

PAUL G. GARDEPHE, U.S.D.J.

            Plaintiff Orient Overseas Container Line Ltd. ("Orient") is a commercial carrier
that contracted with Defendant Crystal Cove Seafood Corp. ("Crystal") to transport a shipment
of frozen tilapia from China to Smyrna, Tennessee.  In this action, Orient seeks $49,364.20 in
demurrage, transportation, and surveying expenses which it incurred as a result of Crystal's
alleged wrongful refusal to accept delivery.  Orient's alleged damages represent $77,350 in
container demurrage and reefer monitoring charges less $30,610 Orient received from its salvage
sale of the cargo.

            Crystal counterclaims under the Carriage of Goods by Sea Act ("COGSA"), 46
U.S.C. § 30701 et seq.  Crystal seeks damages of $60,860, representing the market value of the
tilapia, which Crystal claims was ruined because of a refrigeration unit malfunction.  Orient
concedes that some portion of the cargo was damaged, but nonetheless contests liability and the
appropriate amount of damages.  Crystal seeks sanctions for spoliation of evidence, and both
parties seek attorneys' fees.

In an order dated September 26, 2011, the Court denied Crystal's motion for summary judgment.[1]  The case proceeded to a bench trial on January 4, 2012.  This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

1. Crystal and Orient contracted for the shipment of 3,400 cartons of frozen tilapia from Shekou, China to Smyrna, Tennessee.  Orient Overseas, 2011 WL 4444527, at *1.[2]  The bill of lading provided that the cargo was to be kept at -18.0 Celsius (-0.4 degrees Farenheit).  (Id. at *1)

2. The cargo was in good order and condition when delivered to Orient in China, and was loaded into container OOLU 617235 on July 6, 2009.  (Id.; Px. 1)  The cargo was floor-loaded, as opposed to stacked on pallets.  (Tr. 141)

3. The container was discharged in Long Beach, California on July 26, 2009, and was placed on rail transport in Long Beach on July 28, 2009, arriving in Memphis on July 31, 2009.  The container was discharged at the railyard in Memphis and was transported by truck to an intermodal storage facility on the afternoon of August 3, 2009.  (Px. 22; Tr. 345-47).

---

[1] The Court's Opinion and Order is reported at Orient Overseas Container Line v. Crystal Cove Seafood Corp., No. 10 Civ. 3166(PGG), 2011 WL 4444527 (S.D.N.Y. Sept. 26, 2011). Familiarity with this opinion is presumed.
[2] The parties stipulated to the facts and legal conclusions set forth in this Court's summary judgment opinion.  See Joint Pretrial Order at 5 ("The parties hereby adopt as stipulated findings of fact and conclusions of law those statements of fact and law clearly decided as such by the Court in its September 26, 2011 Memorandum Opinion & Order.")

4. At about midnight on July 29, 2009,[3] the refrigeration unit in Orient's container failed. (Px 24)  The temperature data recorder log for the container shows that the temperature inside the container began rising dramatically during the morning of July 30, 2009.  (Id.) Before the temperature data recorder log stopped functioning on August 4, 2009, the temperature inside the container reached as high as 10 degrees Celsius (50 degrees Farenheit).  (Id.; Orient Overseas, 2011 WL 4444527, at *2)

5. By the time the cargo arrived at its destination in Smyrna, Tennessee on August 4, 2009, the refrigeration unit of the container had not been functioning for more than five days. (Px 24; Tr. 91)

## Preparation of the Container

6. Eric Anderson, Orient's Senior Operations Specialist, is responsible for overseeing the Company's pre-trip inspection of vessels and containers.  While Anderson does not perform pre-trip inspections or maintenance work himself, he is familiar with the Company's policies concerning pre-trip inspection of containers, and is notified of any container problem that develops in North America.  (Tr. 157, 189-90)

7. Anderson and his supervisor, Marty Sherman, were notified on or about August 3, 2009 that the container at issue had malfunctioned due to a problem with its relay board.  (Tr. 166, 207-08; Px 4; Dx C)

8. Orient's internal procedures require that all containers pass a pre-trip inspection before the container is loaded and before it is released to the shipper.  (Tr. 159)

9. On June 26, 2009, before the container at issue was loaded, a pre-trip inspection of the container was conducted; the container and its refrigeration unit were found to be in good

---

[3] The temperature log in Px 24 is in Greenwich Mean Time.  Memphis and Smyrna, Tennessee are in the Central time zone, which is six hours ahead of Greenwich Mean Time.

working order.  (Tr. 172-73)  Anderson testified that relay boards are checked as part of the pre-trip inspection.  (Tr. 166)  If there had been a problem with the relay board at the time of the pre-trip inspection, the container would have failed its inspection.  (Tr. 174)

10. Anderson further testified that he is not aware of any preventive maintenance that could have been performed on the relay board that could have prevented the malfunction.  He likewise testified that no inspection could have permitted Orient to predict a future problem with the relay board.  (Tr. 167)

11. The relay board and wiring do not have parts that show wear or that require regular maintenance, and Orient did not "expect[] a problem with the relay board and wiring," given that the container had only been in service for about one year.  (Anderson Decl. ¶¶ 13, 18; Tr. 200)  Containers of this sort have a useful life of approximately 12 to 15 years.  (Anderson Decl. ¶¶ 5, 16)

12. Each container has a data logger that gives a "history of the unit."  (Tr. 162)  The data logger stores a record of the container's temperatures and pre-trip inspection history.  (Tr. 163; Px 3 at 1-32)

13. Where a refrigeration unit is not operating properly, the data logger will eventually stop, because there is no power to the unit.  (Tr. 164)  Here, the data logger stopped functioning on August 4, 2009.  (Tr. 182)

**Events Between August 1 and August 3, 2009**

14. Orient learned on Saturday, August 1, 2009, that the refrigeration unit had malfunctioned but did not notify Crystal of the malfunction until Monday, August 3, 2009.  (Orient Overseas, 2011 WL 4444527, at *1)

4

15. Upon learning of the malfunction on August 3, 2009, Crystal immediately authorized Orient to break the seal on the container and requested that Orient transload the cargo into a working refrigeration container.  (DeGrand Decl. ¶ 13)

16. Richard Ng is the claims manager at Orient.  (Tr. 263-64)  He was notified of the container malfunction on August 3, 2009.  (Tr. 276)  Ng. was also aware that Crystal had requested that the cargo be immediately transloaded into a working container.  (Tr. 277)

17. E-mails between Ng and other Orient employees on August 3, 2009, demonstrate that they were aware of the urgent need to transload the cargo into a container with a working refrigeration unit.  (Dx C)  In an August 3, 2009 e-mail, for example, Marty Sherman tells an Orient associate, "Rather than wait until morning we need to get this load into [a] working unit ASAP."  (Px 63; Dx C)

18. Ng decided, however, that there was not "enough time" to transload the cargo into a working container on August 3, and that the cargo should be kept in the non-working container until the following morning, when it was scheduled to be delivered to U.S. Cold Storage ("USCS"), a warehouse in Smyrna.  (Tr. 277)  Ng testified that he wanted the transloading to take place in a refrigerated facility, and was not able to locate such a facility in the Memphis area.  (Tr. 277-78)

19. Ng testified that he contacted other Orient employees in Memphis and Houston for help in locating a cold storage facility where the cargo could be stored or transloaded, but no such facility could be located. (Px 63; Dx C; Tr. 289, 309, 354-55)  Indeed, Ng testified that he was told that USCS was the only such facility in Tennessee.  (Tr. 309-10, 359)

20.  Ng's testimony concerning the existence of other cold storage facilities, and the time it would take to transload the cargo, was not credible.  There are, in fact, numerous other

cold storage facilities in Tennessee and in adjoining states.  (DeGrand Supp. Decl. ¶¶ 3, 5, Ex A)  As to the time it would take to transload the cargo, Orient's contemporaneous communications indicate that transloading could be completed in three hours.  (Dx C) Ng – who has never been involved in transloading a container – testified that it would "take[] at least four or five hours to transload the whole container."  (Tr. 277)

**Arrival at USCS on August 4, 2009**

21. Having decided not to transload the cargo into a working container on August 3, Orient proceeded to deliver the container to USCS – Crystal's designated agent for delivery – on August 4, 2009.  (Orient, 2011 WL 4444527, at *1)  The container arrived that morning between 9:30 and 10:00.  (Tr. 89)

22. When the shipment arrived, the driver told the plant supervisor, Tim Greer, that the refrigeration unit for the container had not been operating for the past three to five days. (Tr. 91, 93)  In his testimony, Greer noted that it is "sweltering . . . hot" in Tennessee in August.  (Tr. 88)

23. Upon arrival at USCS, the ambient air inside the container was approximately 70 degrees Farenheit, and the cargo was giving off a "horrendous" smell.  (Tr. 91-92, 97)  Using a digital thermometer, Greer punctured five or six boxes of fish to test the temperature in the center of each box.  The center of each box registered at approximately 30 degrees Farenheit.  (Tr. 89-90)  Greer communicated this information to Crystal.  (Tr. 94)

24. Crystal instructed Greer to reject delivery of the shipment, and he did so.  (Tr. 97) Greer's notes on the bill of lading read:  "The container arrived with the unit not running. The seal was broken to inspect and temp product.  I feel the odor from the product may contaminate the whse.  Temp 29.8 to 30.3" (Tr. 107-08; Px 55)

6

25. Greer testified that he would not have allowed the cargo to be stored in USCS's general warehouse storage area without testing it to make sure that it would not contaminate other food products in the warehouse.  (Tr. 97, 99)  Had testing confirmed that the cargo did not present a risk to other food products stored at USCS, USCS would have stored the cargo for a total fee of $4,390 for the period between August 2009 and March 2010.  (Tr. 119-22)

26. The Court credits Greer's testimony as to the events of August 4, 2009 and the condition of the cargo when it arrived at USCS.  Greer was the only witness to testify live at trial who actually saw the cargo.  (Tr. 330)  Moreover, his testimony concerning the condition of the cargo is – as discussed below – fully consistent with the reports prepared by the surveyors hired by both sides.

27. After USCS refused to take delivery of the container, Ng continued to pressure Crystal to take delivery of the cargo.  (Tr. 287-88)

28. On August 6, 2009, Orient transloaded the cargo into a new, working container.  The transloading was completed in approximately three hours.  (Tr. 289-90; Px 21)

29. The Court concludes that Orient was negligent in its handling of the cargo from August 1, 2009, when it discovered that the refrigeration unit on the container had malfunctioned. Not only did Orient wait two days before informing Crystal of the problem, it also failed to transload the cargo when asked to do so.  The cargo should have been transloaded to a working container immediately, as Orient's own employees urged in writing at the time. As it was, the fish remained in a non-working container from August 1 to August 6, 2009, in sweltering heat.

**The Joint Survey**

30. Ng contacted Todd Bellone at Bell One Control Services, Inc. to arrange for a survey of the cargo.  (Tr. 224-25)

31. Bellone asked Bennie Greiner at T.M. Cargo, Inc. to conduct a survey on behalf of Orient.  (Tr. 226)  Bellone's instructions to Greiner were set forth in the following email: "Please open several cartons at random looking for evidence of thawing and refreezing. Please advise if the IQF glaze is intact and look for any evidence of dehydration (freezer burn), clumping or abundance of ice crystallization."  (Tr. 226-27; Px 25)

32. On August 18, 2009, the cargo was brought to USCS for purposes of a survey.  (Tr. 101-02)  Greiner represented Orient at the survey, while Ruben Maxwell represented Crystal. (Tr. 101)

33. Greer was present for the survey, which took place in USCS's "cold dock" and lasted approximately an hour or two.  (Tr. 102-03, 109)  The surveyors opened a number of boxes taken from various parts of the container.  (Tr. 102, 112)

34. Greer helped the surveyors reach the boxes that they wanted to examine; they did not ask him to unload the entire load.  (Tr. 115-16)  Greer went approximately 15 feet into the container to take samples.  (Tr. 112)  It was clear to him that the product had thawed and then been refrozen in the new container; it still had an odor.  (Tr. 118)  As the surveyors examined the cargo, Greer heard both Greiner and Maxwell say that the cargo appeared to be a loss, and they did not see any sense in opening more boxes.  (Tr. 102-03, 111)

35. Bellone testified that he spoke with Greiner and Greer on August 18 while the surveyors were at USCS, and Greer would not allow the entire shipment to be unloaded at USCS. (Tr. 229-30)  However, Greer testified that he would have opened as many boxes as the

surveyors requested – from anywhere in the container – had he been asked to do so.  (Tr. 115, 148)  The Court credits Greer's testimony and further concludes that both sides' surveyors decided after examining 15 to 20 boxes selected at random that the cargo was a total loss.

36. Both surveyors prepared reports discussing the condition of the cargo.  (Orient Overseas, 2011 WL 4444527, at *2)  Greiner – Orient's surveyor – reported that she had "randomly selected cartons of fish to open" and "in all instances" found "varying degrees of freezer burn . . . clumping  . . . and in numerous instances discoloration."  (Px 12 at 2)  Greiner wrote that the surveyors "progressed further into the container and continued to randomly inspect cartons," noting "the same conditions as previously si[gh]ted."  (Id.)  Maxwell concluded that the fish "is not usable as a prime food source" and that it had "no salvage recovery potential."  (Px 54 at 3)  Maxwell recommended that the shipment be "disposed of in a proper fashion with a certified ticket of destruction."  (Id. at 4)

37. While Bellone testified that he was upset and disappointed that Greer would not permit the surveyors to fully unload the cargo (Tr. 232-33), the Court concludes that Greer was prepared to produce any box the surveyors wished to examine.  Moreover, it is apparent that Greiner followed the instructions she had been given by Bellone.  (Px 25) ("Please open several cartons at random looking for evidence of thawing and refreezing.")  The Court concludes that Bellone's complaints about access to the container's contents emerged only after it became apparent that Greiner had concluded that the cargo was a total loss.

**The Storage of the Cargo from August 2009 to March 2010**

38. Following the survey, Orient transported the cargo to Intermodal Cartage in Memphis, Tennessee, where it remained in the Orient container until March 2010.  (Orient Overseas, 2011 WL 4444527, at *2)  Over the seven months between August 2009 and March 2010, the parties squabbled about liability and damages.  (Tr. 417, DxJ, Px 45,48)

39. During the August 2009 to March 2010 time period, Crystal instructed Orient that it was not authorized to sell or otherwise dispose of the cargo.  See, e.g., Px 15 at 2 ("You are hereby notified that OOCL is to take no action whatsoever to sell, dispose of or otherwise impair the rights of Crystal Cove in the subject cargo until notified to do so by Crystal Cove or its attorneys."); Dx J at OOCL-00484 ("Crystal Cove demands that no sale of the cargo take place. . . . OOCL does not have the right to sell the cargo"); Tr. 306-07)

40. In March 2010, Orient instructed Bellone to sell the cargo.  Bellone sent a bid letter to three salvage companies.  (Tr. 237-39, Px 27)  On or about March 16, 2010, one of the salvage companies, Front Street Commodities, purchased the frozen tilapia on an "as is" basis for $30,610.  (Tr. 241; Px 19)  There is no evidence that the frozen tilapia would have fetched a higher price if sold earlier.

41. It is undisputed that the fair market value of the frozen tilapia – if it had been delivered in a non-compromised state – was $60,860.  (Tr. 68; Px 49)

## CONCLUSIONS OF LAW

### I.    CRYSTAL HAS ESTABLISHED ITS COGSA COUNTERCLAIM

In its summary judgment opinion, this Court found that Crystal had established a prima facie case under COGSA,[4] because Orient had conceded that the cargo was "in good order and condition [when] . . . received by [Orient]," and further "concede[d] that some of Crystal['s] cargo was damaged before [Orient] delivered the cargo."  (Orient Overseas, 2011 WL 4444527, at *4)  Orient contended at summary judgment and at trial, however, that it had acted with due diligence, and that Crystal had not demonstrated that Orient's negligence caused all or part of the damage to the cargo.  Although Orient acted with due diligence at the beginning of the voyage, the Court finds that (1) it acted negligently after discovering the malfunction in the refrigeration unit; and (2) its negligence caused damage to the cargo.

#### A.    Orient Acted with Due Diligence at the Outset

Once a shipper makes out a prima facie case under COGSA, the burden shifts to the carrier to show that a statutory exception to liability applies, American Home Assur. Co. v. Zim Jamaica, 418 F.Supp.2d 537, 545 (S.D.N.Y. 2006) [hereinafter Zim Jamaica II] (citing Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428,433 (2d Cir. 2005)), or by proving that "it exercised due diligence to avoid and prevent the harm."  Id. (citing  Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 429 (2d Cir.1962) (Friendly, J)); see also Marine Office of America

---

[4]  In the bill of lading, the parties agreed that COGSA governed "throughout the carriage by sea and the entire time that the Goods are in the actual custody of the Carrier or its sub contractor . . . or after discharge therefrom as the case may be."  (Px 2 ("Terms and Conditions of the OOCL bill of lading" at paragraph D))  COGSA provides that a shipper and carrier may extend COGSA's application by contract to cover "the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea."  COGSA § 7.

Corp. v. Lilac Marine Corp., 296 F.Supp.2d 91, 102 (D.P.R. 2003).  Orient has not argued that a statutory exception to liability applies, but does contend that it acted with due diligence.

COGSA requires a carrier to use due diligence to "make the ship seaworthy at the beginning of the voyage"; "to properly man, equip, and supply the ship"; and to "make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation."  COGSA §§ 3(1)(a)-(c).  Thus, "[t]he use of defective or inadequate equipment or gear not reasonably suited for the purposes for which it is used may render a vessel unseaworthy."  Kentucky Fried Chicken Int'l Corp., v. S/S Ponce, et al., 1988 U.S. Dist. LEXIS 3225 at *13-14 (E.D. La. April 13, 1988) (citing Martinez v. Dixie Carriers Inc., 529 F.2d 457, 467 (5th Cir. 1976)).

"'[T]he issue [of due diligence] is always a factual one, the determination of which is unique to each case.'"  Chiquita Intern., Ltd. v. MV Canis J, No. 00 Civ. 2257(AGS), 2001 WL 986717 at *2 (S.D.N.Y. 2001) (citing Holsatia Shipping Corp. v. Fidelity and Cas. Co., 535 F.Supp. 139, 145 (S.D.N.Y.  1982)).  Due diligence is measured by "whatever a reasonably competent vessel owner would do under the circumstances."  Complaint of Tecomar, S.A., 765 F.Supp. 1150, 1179 (S.D.N.Y. 1991).  A visual inspection may – depending on the nature of the defect or loss – be sufficient to demonstrate due diligence.  Margarine Verkaufsunion G.m.B.H. v. M.T.G.C. Brovig, 318 F.Supp. 977, 981 (S.D.N.Y. 1970) (Weinfeld, J.) (due diligence established where surveyor performed pre-trip inspection, including visual examination); see also Steel Coils, Inc. v. M/V Lake Marion, 331 F.3d 422, 431 (5th Cir. 2003) (due diligence not established where hatches were not maintained in good condition and where carrier had not determined that hatches were watertight prior to embarkation).

Here, the evidence demonstrates that the cause of the refrigeration unit malfunction was a breakdown in the relay board.  (Tr. 166; Px 4)  The evidence further demonstrates that Orient conducted a pre-trip inspection of the container before the voyage, and it is undisputed that this inspection disclosed no defects in the relay board.  (Tr. 159, 173-74; Px 3 at 27)  There is no evidence that any additional testing would have disclosed a defect in the relay board.  See Tr. 166-67.  Indeed, the refrigeration unit worked properly for a month after the cargo was loaded on the container.  (Px 24)  The Court concludes that Orient has demonstrated that it acted with diligence prior to the voyage.

### B.   Crystal has Established that Orient's Negligence Caused the Damage to the Cargo

Once a carrier has shown that it acted with due diligence in preparing for a voyage, the burden shifts to the shipper to demonstrate that the carrier was negligent in its handling of the cargo.  Hartford Fire Ins. Co. v. Novocargo USA Inc., 257 F. Supp.2d 665, 672 (S.D.N.Y., 2003) ("the burden return [s] to the [moving party] to show that the carrier's negligence contributed to the damage") (citing O'Connell Mach. Co. v. M.V. "Americana", 797 F.2d 1130, 1133 (2d Cir. 1986)).  Here, Orient was negligent in failing to immediately transload the cargo into a working container on August 1, 2009, after discovering the malfunction in the refrigeration unit.  Moreover, Orient's negligence caused damage to the cargo.  By the time the container arrived at USCS on the morning of August 4, 2009, there is undisputed evidence that the fish had partially thawed, and was giving off a strong odor.

Orient discovered the malfunction on August 1, 2009; did not notify Crystal of the malfunction until August 3, 2009; and then failed to transload the cargo into a working container – despite Crystal's request – until August 6, 2009.  (Tr. 277; Orient Overseas, 2011 WL 4444527, at *1-*2)  The fish thus remained in a non-functioning container for more than seven

13

days in 90 degree heat.  Ng made the decision on August 3 not to transload the fish despite being informed by his subordinates that "[r]ather th[a]n wait until morning we need to get this load into [a] working unit ASAP."  (Tr. 276-77; Px 63 at 2; Dx C)

As noted above, none of Ng's explanations for the delay in transloading the fish are convincing.  He exaggerated the time necessary to perform the transloading, and his claim that a cold storage facility was necessary to transload the cargo ignores the fact that a working container could have been backed up to the broken container – which was eventually done on August 6, 2009.  (Tr. 289-90; Px 21)  Finally, Ng's assertion that no cold storage facility was available in Tennessee or in neighboring states is not credible.  (Tr. 277-78, 289-90; Px 21)

This Court concludes both that Orient was negligent in handling the cargo and that its negligence caused damage to the cargo.

### C.    <u>Damages</u>

#### 1.  <u>Legal Standard for Damages Under COGSA</u>

"Under COGSA, the ordinary measure of a cargo owner's recovery is 'the market value of the goods at destination, in like condition as they were shipped, on the date when they should have arrived.'"  <u>Fortis Corporate Ins., S.A. v. M/V Cielo Del Canada</u>, 320 F. Supp.2d 95, 107 (S.D.N.Y. 2004) (quoting <u>Internatio, Inc. v. M.S. Taimyr</u>, 602 F.2d 49, 50 (2d Cir.1979) and citing <u>Gulf, Colorado & Sante Fe Ry. Co. v. Texas Packing Co.</u>, 244 U.S. 31, 37 (1917)).  The guiding principle is to set damages at "'the amount necessary to put the injured parties in the exact position they would have been in had there been no breach'; computation of damages is a factual issue for decision by the trial court, and will be affirmed unless it is clearly erroneous."  <u>Del Monte Fresh Produce Int'l Inc. v. M/V Cap Domingo</u>, No.02 Civ. 9544 (JCF), 2004 WL

2222166 (S.D.N.Y. Sept.30, 2004) (quoting Seguros Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855, 860-61 (2d Cir.1985).

Where, as here, the shipper has demonstrated both that the carrier was negligent and that the carrier's negligence caused damage to the cargo, "the carrier must bear the entire loss unless he can show what portion of the damages is attributable to some cause for which he is not responsible." Schnell v. The Vallescura, 293 U.S. 296, 304 (1934); see also M. Golodetz v. S/S Lake Anja, 751 F.2d 1103, 1111 (2d Cir. 1985); Fortis, 320 F.Supp. at 105-06 (quoting Transatlantic Marine Claims v. M/V OOCL Inspiration, 137 F.3d 94, 98 (2d Cir. 1998) ("The law casts upon [the carrier] the burden of the loss which he cannot explain, or, explaining, bring within the exceptional case in which he is relieved.").

"Ordinarily, the measure of damages under COGSA is the difference between the market value of the shipment at destination had it arrived in good condition and its market value as damaged." Bosung Industrial Co. v. M.V. Aegis Sonic, 590 F.Supp. 908, 914 (S.D.N.Y. 1984) (citations omitted). "The fair market value rule, however, is not the sole method for computing damages, and alternative methods may be used in order to adequately compensate a [shipper] for its loss." Id. For example, under COGSA, where a carrier's negligence has rendered cargo "practically valueless," a shipper is not required to take delivery of the damaged goods and may recover their replacement cost.[5] Id. at 915.

In Bosung, for example, the court held that a consignee was not required to accept delivery of a shipment of pipe where it had been "damaged by chipping at the ends, cracking,

---

[5]  Orient agreed at trial that the "practically valueless" standard is applicable here:  "[Y]our Honor is absolutely correct in your understanding of the [Bosung Industrial Co. v. M.V.] Aegis Sonic case. . . .The consignee or the shipper's responsibility is to take delivery of the cargo when delivery is tendered.  When the carrier brings it to him, the carrier delivers it, they have to receive it and, you are correct, unless it is practically valueless."  (Tr. 12) (emphasis added).

and crushing" and thereby rendered useless to the consignee.  Id. at 911-12.  The court noted that while a consignee's duty to accept delivery of goods "is not ordinarily excused by the fact that the goods are damaged," a consignee need not accept delivery where

> such damage renders the property practically valueless, having regard to the expense of acceptance and use, and to the purpose for which it was intended.

Id. at 914 (citing J. Miller, Law of Freight Loss and Damage Claims, § 506.1 (2d ed. 1961).

Other courts have applied the same rule.  See, e.g., Larsen v. A.C. Carpenter, Inc., 620 F.Supp. 1084, 1126 (E.D.N.Y. 1985), aff'd mem., 800 F.2d 1128 (2d Cir. 1986) (holding that shipper of seed potatoes was not obligated to take delivery where potatoes were found rotted and infected with a pernicious bacteria at the port of discharge; "APRA was not obligated to take delivery, considering the cargo's arrival condition and intended purpose") (citing Cargill, Inc. v. S/S Nasugbu, 404 F.Supp. 342, 349 (M.D.La. 1975) ("The duty of the consignee . . . to accept delivery . . . is not ordinarily excused by the fact that the goods are damaged, unless such damage renders the property practically valueless, having regard . . . to the purpose intended.") (citing Miller, Law of Freight Loss and Damage Claims, § 506.1 (1st ed. 1953))); Amstar Corp. v. S.S. Naashi, 75 Civ. 4895, 1978 A.M.C. 1845 (S.D.N.Y. 1978) (upholding shipper's rejection of 358,664 pounds of sugar where bottom 1 to 2 inches of sugar in hold was contaminated by diesel fuel, even though 8 to 10 feet of sugar piled on top appeared to be sound and was later proven sound); see Schoenbaum, Admiralty and Maritime Law, § 10.6 at 799 (5th ed. 2011) ("The consignee is obligated to accept delivery by a carrier notwithstanding the fact that goods are damaged, unless the damage renders the goods 'practically valueless.'"); see also Kentucky Fried Chicken Int'l Corp., 1988 U.S. Dist. Lexis 3225 at *9 (upholding KFC's rejection of shipment of chicken nuggets after "exposure to high temperatures had changed the color and flavor of the product so as to render it unfit for use in the franchise outlets").

16

Fortis Corporate Ins., S.A. v. M/V Cielo del Canada, 320 F. Supp.2d 95
(S.D.N.Y. 2004) is instructive as to carrier liability where a shipment has not been rendered
worthless for all purposes.  That case involved a shipment of peas and lentils that was exposed to
sea water during a voyage.  The cargo was packaged in sacks; 807 of the 2820 sacks were wet,
while the remaining 2013 appeared dry.  320 F. Supp.2d at 99.  The parties agreed "that there
was no apparent water damage to over two-thirds of the beans."  Id.  The wet sacks "had a
distinct and repulsive odor," however, and the court found that this odor had permeated the
contents of the dry sacks as well.  (Id. at 99-102)  In determining damages, the court held the
carrier liable for the entire cargo, even though it had not been shown that all of the cargo was
non-salvageable:  "It is undisputed that these bags of food for human consumption were, due to
defendant's fault, packed for an indefinite period at sea in a container with rotting, fermenting
food products that gave off a foul stench. . . . [T]he Court finds that the legumes contained in
most or all of the dry bags had themselves taken on this odor.  Thus, even if the upper bags were
dry and were not obviously completely spoiled, they were not in sound condition."  Id. at 105.

       In evaluating a shipper or consignee's actions in response to an attempted delivery
of damaged goods, and in connection with such a party's claim for damages, courts consider
whether the shipper or consignee's actions "were outside 'the range of reason.'"  Id. at 107.
"This is particularly so where food products are involved."  Id.; see also Amstar Corp., 1978
A.M.C. 1845 ("At issue is whether plaintiff [shipper] acted reasonably in rejecting the cargo [of
sugar] in hold #3 without taking any steps to segregate sound from damaged sugar. . . . '[A
shipper] ought not be deprived of recovery if its conduct came within the range of reason, even if
the full light of reason was not, in fact, brought to bear.'  Ellerman Lines, Ltd. v. The President
Harding, 288 F.2d 288, 291 (2d Cir. 1961).  The fact that the . . . sugar [above the bottom 1 to 2

inches in the hold] turned out to be sound does not mean that plaintiff acted unreasonably."); see also Bosung, 590 F.Supp. at 914 ("the Court finds that Bosung acted reasonably in refusing to accept delivery of the pipe.  Plaintiffs are therefore entitled to recover damages for the total loss of the consignment of pipe.")

### 2.  Crystal Is Entitled to Damages Under COGSA

This case presents unusual facts:  the shipper rejected delivery of seriously compromised food cargo damaged as a result of the carrier's negligence; the carrier nonetheless pressured the shipper to take delivery of the cargo; the parties then spent the next seven months disputing what should happen to the cargo, while it remained stored in the carrier's container; after seven months, the carrier – without authorization from the shipper – sold the cargo at a much higher price than the survey reports suggested it might be worth.  Orient obtained $30,610 from the salvage sale of the cargo, while Crystal has not received any compensation for its $60,860 loss – the undisputed fair market value of the frozen tilapia if delivered in good condition.

As noted above, Orient bears the initial burden of segregating the portion of the loss caused by its negligence from the portion of the loss caused by some other cause for which it is not responsible.  Vallescura, 293 U.S. at 304.  Here, Orient has not shown that it is responsible for only part of the damage to the cargo.  The record shows that Orient was negligent in not immediately transloading the tilapia into another container after discovering the malfunction in the original container's refrigeration unit.  As a result of Orient's negligence, the fish thawed and spoiled, as demonstrated by, inter alia, the temperature readings and strong smell apparent when the seal on the container was broken on the morning of August 4, 2009, and by the reports from both Crystal and Orients' surveyors.  Orient must compensate Crystal for the damaged cargo.

Although Orient argues that Crystal failed to mitigate its damages, by the time the container arrived at USCS the cargo was in such a compromised condition that Crystal was within its rights to reject delivery. Orient has not shown that Crystal's decision to reject delivery was unreasonable. Orient's negligence placed Crystal in a difficult position: the frozen tilapia was plainly compromised, and USCS would not accept the cargo without testing confirming that it presented no threat to food products already on site. (Tr. 97, 99) Given Greer's description of the cargo's condition, it was reasonable for Crystal to conclude that the cargo was "practically valueless" for its intended purpose, which was human consumption. Given the expense of testing, storing and then attempting to sell the compromised fish, Crystal was within its right to reject the shipment under COGSA. Fortis, 320 F.Supp. 2d at 107 ("Even if there was a theoretical possibility of salvaging some value from a portion of the cargo, the consignee cannot be expected to undertake significant expenses on the purely speculative hope that some part of a malodorous shipment of food might eventually be found fit for human consumption. . . .")

The subject container arrived at USCS having been non-operational for more than five days in 90 degree heat. Greer testified that the ambient air inside the container was approximately 70 degrees Farenheit, and the cargo was giving off a "horrendous" smell. (Tr. 91-92, 97) At the center of the five or six boxes of fish Greer punctured with a digital thermometer, the temperature was approximately 30 degrees Farenheit, far above the -0.4 degrees Farenheit required under the bill of lading. (Tr. 89-90; Orient Overseas, 2011 WL 4444527, at *1) Greer's testimony about the compromised condition of the fish was fully supported by the reports of the two surveyors, Greiner and Maxwell. (Px 12, 54)

Both surveyors determined that the tilapia had thawed and was then refrozen in the replacement container. (Id.) Greiner – Orient's surveyor – stated that "in all instances" she

19

"found varying degrees of freezer burn on the fish," as well as "clumping of the fish and in numerous instances discoloration," even as she "progressed further into the container and continued to randomly inspect cartons."  (Px 12 at 2) (emphasis added)  Maxwell – Crystal's surveyor – determined that the "product [was] not usable as a prime food source" and that there was "no salvage potential."  (Px 54 at 3)  Maxwell recommended that the shipment be "disposed of in a proper fashion with a certified ticket of destruction."  (Id. at 4)  Greer, who was present for the surveys and overheard the surveyors' discussion, confirmed that both surveyors viewed the cargo as a total loss.  (Tr. 102-03)

   The fact that Orient was later able to sell the cargo, at salvage, for $30,610 does not undermine the conclusion that the cargo was "practically valueless" for its intended purpose. The intended purpose here was human consumption, and all the evidence – from both Greer and the surveyors – supports a conclusion that the fish was not appropriate for human consumption. There is no evidence that the salvage company sold the tilapia for human consumption.

   In sum, Orient has not shown "what portion of the damages is attributable" to Crystal, nor can it show that Crystal acted unreasonably in rejecting the shipment.  M. Golodetz, 751 F.2d at 1111; Fortis, 320 F.Supp. 2d at 106.  Because the cargo – upon arrival at USCS – was "practically valueless" for its intended purpose, Crystal was within its rights to reject delivery and is entitled to $60,860 – the undisputed fair market value of the cargo in good condition.  See Bosung, 590 F.Supp. at 915 ("Since the concrete pipe was totally useless as delivered, plaintiffs are entitled to recover its replacement cost."); Amstar, 1978 AMC 1845 ("Plaintiff . . . is entitled to recover the full amount of the cargo damage").

       **3.**      **Pre-Judgment Interest**

       "The allowance of prejudgment interest in admiralty is committed to the trial court's discretion, although the Second Circuit has noted that it should be granted absent exceptional circumstances." Fortis, 320 F.Supp. 2d at 107-08, citing Mitsui & Co., Ltd. v. American Export Lines, Inc., 636 F.2d 807, 823 (2d Cir. 1981).  The Supreme Court has held that neither a good faith dispute over liability nor the existence of mutual fault justifies denial of pre-judgment interest.  City of Milwaukee v. Cement Div., Nat. Gypsum Co., 515 U.S. 189, 199 (1995).  It is only when there is clear evidence of undue delay or some other "peculiar circumstance" that a court should deny an award of pre-judgment interest.  S.E.C. v. Antar, 97 F.Supp.2d 576 (D.N.J. 2000) (citing Koch Refining Co. v. Jennifer L. Boudreau  M/V, 85 F.3d 1178, 1184 (5th Cir. 1996)).

       District courts in this Circuit have broad discretion to fix both the rate of pre-judgment interest and the date when such interest begins.  Man Ferrostaal, Inc. v. M/V Akili, 763 F. Supp.2d 599, 614 (S.D.N.Y. 2011) (citing Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse, 996 F.2d 506, 520 (2d Cir.1993)).  In determining the rate of pre-judgment interest, an award of interest based on the average annual United States Treasury Bill rate is becoming more common. "The [treasury bill] rate more closely parallels the income the damages would have earned in a short-term, risk-free investment." Id. (citing Dessert Service, 219 F.Supp.2d at 509 (S.D.N.Y.2002).  Pre-judgment interest is "ordinarily awarded from the time when destroyed or lost goods should have been delivered by the carrier," Mitsui & Co., 636 F.2d 807, 824 (2d Cir. 1981) although the district court has broad discretion to decide when interest begins and what rate to apply.  Mitsui Marine Fire and Ins. Co., Ltd. v. Direct Container Line, Inc., 119 F. Supp.2d 412, 417 (S.D.N.Y. 2000).

The Court concludes that Crystal is entitled to pre-judgment interest running from August 4, 2009 – the date on which the cargo arrived at USCS – on the basis of the 52-week Treasury bill rates in effect on August 4 of each year, compounded annually.[6]

## II.   ORIENT'S DEMURRAGE CLAIM

In the Complaint, Orient asserts that Crystal is liable for $77,350 in demurrage and reefer monitoring charges, $647.50 in trucking costs, and $1,976.70 in surveying expenses associated with Crystal's allegedly wrongful refusal to take delivery of the cargo.[7]   (Cmplt. ¶¶ 13-16)

### A.   Applicable Law and Contract Provisions

A "shipping contract consists of the bill of lading and the applicable tariffs lawfully published and filed." Missouri Pac. R. Co. v. Elmore and Stahl, 377 U.S. 134, 144 (1964).  As a general rule, "contracts for carriage of goods by sea must be construed like any other contracts:  by their terms and consistent with the intent of the parties." Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14, 16 (2004).   Where a bill of lading is ambiguous, "an interpretation that gives a reasonable and effective meaning to all terms . . . is preferable to one that leaves a portion of the writing useless or inexplicable." Hartford Fire Ins. Co. v. Orient Overseas Container Lines (UK), 230 F.3d 549, 558 (2d Cir. 2000).  The Court's "task ... is to construe the contract to give consistent effect, if possible, to all of its terms." Federal Ins. Co. v.

---

[6]  Crystal's request for punitive damages is denied.  While courts in this district have ruled that punitive damages are available in COGSA cases, see, e.g., Leather's Best Intern., Inc. v. MV Lloyd Sergipe, 760 F.Supp. 301, 313-14 (S.D.N.Y. 1991); Armada Supply, Inc., v. S/T Agios Nikolas, 639 F.Supp. 1161, 1165 (S.D.N.Y. 1986), "punitive damages are awarded only when the defendant's conduct is so morally reprehensible that it implies a criminal indifference to civil obligations." Leather's Best Intern., Inc., 760 F.Supp. at 313-14.  The evidence here does not meet this standard.

[7]  Orient seeks $49,364.20 in damages, having received $30,610 from its salvage sale of the frozen tilapia.  (Cmplt. ¶¶ 18-20)

<u>Great White Fleet (US) Ltd.</u>, No. 07 Civ. 2415(GEL), 2008 WL 2980029, at *5 (S.D.N.Y. 2008)

(<u>citing</u> <u>Pannell v. United States Lines Co.</u>, 263 F.2d 497, 498 (2d Cir.1959).). "'[B]ills of lading

are contracts of adhesion and, as such, are strictly construed against the carrier.'" <u>GSI Grp, Inc.</u>

<u>v. Zim Integrated Shipping Services, Ltd.</u>, 562 F. Supp.2d 503, 506 (S.D.N.Y. 2008) (<u>quoting</u>

<u>Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro</u>, 775 F.2d 476, 486 (2d

Cir. 1985)).

Orient relies on the following language in the bill of lading for its demurrage

claim:

> <u>[i]lf the Merchant fails to take delivery of the Goods or part of them upon</u>
> <u>expiration of the tariff's prescribed free time, the Goods shall be deemed to</u>
> <u>have been delivered to the Merchant</u> and the Carrier may with or without
> notice, but subject to its lien, unpack the Goods if packed in Container and/or
> store or warehouse the Goods or any part thereof ashore, afloat, in the open or
> under cover at the sole risk and expense of the Merchant.  <u>Thereupon, the</u>
> <u>liability of the Carrier in respect of the goods shall cease wholly and the costs</u>
> <u>of such storage (if paid or payable by the Carrier or any agent or sub-contractor</u>
> <u>of the Carrier) shall forthwith upon demand be paid by the Merchant to the</u>
> <u>Carrier.</u>

(Px 2 at 13) (emphasis added).

Crystal argues that Orient is not entitled to the costs of storage because it was not

able to "tender cargo" due to the poor condition of the tilapia.  Section Four of the tariff states in

relevant part:

> <u>Carrier Inability- USA</u>
>
> "<u>When the carrier is for any reason unable to tender cargo for delivery during</u>
> <u>free time, free time will be extended for a period equal to the duration of the</u>
> <u>carrier's inability to tender the cargo.</u>  If such condition arises after the
> expiration of free time, no demurrage or first period demurrage will be charged
> for a period equal to the duration of the carrier's inability to tender the cargo."

(Px 5 at 7) (emphasis added)

In addition to these terms from the bill of lading and applicable tariff, COGSA is, as noted above, expressly incorporated into the bill of lading and was extended to govern "throughout the carriage by sea and the entire time that the Goods are in the actual custody of the Carrier or its sub contractor . . . or after discharge therefrom as the case may be."  (Px 2 ("Terms and Conditions of the OOCL bill of lading" at paragraph D))

**B.   <u>Analysis</u>**

While the bill of lading and tariff do not explicitly address the situation here – attempted delivery of cargo that is "practically valueless" and not suitable for warehouse storage absent testing – it is clear under COGSA that a shipper who lawfully refuses to accept delivery cannot be held liable for demurrage and related expenses.  In <u>Bosung</u>, for example, the carrier – Atlanta Shipping Corp. – counterclaimed for demurrage associated with Bosung's refusal to accept damaged pipe.  <u>Bosung</u>, 590 F.Supp. at 912.  In rejecting the claim, the district judge noted that "[i]t follows from the Court's finding that Bosung was justified in refusing to accept delivery of the pipe that Atlanta's counterclaim for $81,654.84 in delay and other expenses must be dismissed."  <u>Id.</u> at 915.  Similarly, in <u>Larsen</u>, where the court found that the shipper had lawfully rejected a shipment of rotten potatoes, the shipper was ruled "not liable to [the carrier] for . . . demurrage, detention and related expenses."  <u>Larsen</u>, 620 F.Supp. at 1127; <u>cf. Cargill, Inc.</u>, 404 F. Supp. at 349 (where cargo arrived in a damaged "but not totally useless condition," consignee was obligated to take delivery and pay demurrage due under the charter party).

If the conduct at issue here ended with Crystal's refusal to take delivery, that would be the end of the matter.  After rejecting the shipment and arranging for the joint survey, however, Crystal instructed Orient not to sell or otherwise dispose of the cargo.  In an August 28, 2009 letter to Orient, Crystal's counsel demanded that Orient "take no action whatsoever to sell,

24

dispose of or otherwise impair the rights of Crystal Cove in the subject cargo until notified to do so by Crystal Cove or its attorneys."  (Px 15 at 2)  Similarly, in a March 12, 2010 letter – nearly seven months later – Crystal continued to "demand[] that no sale of the cargo take place."  (Ex. J at OOCL-00484)  Having demanded that Orient continue storing the frozen tilapia for seven months, Crystal bears responsibility for reasonable storage fees.

Orient argues that Crystal is liable for the applicable demurrage fees under the bill of lading and tariff, and asserts that these fees amount to $77,350.  As noted above, however, Orient's delivery of "practically valueless" cargo defeats its claim for demurrage.  Even assuming <u>arguendo</u> that the demurrage terms in the bill of lading and tariff apply, Orient would have an obligation to mitigate its damages.  <u>APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.</u>, 592 F.3d 108, 111 (2d Cir. 2010) (carrier had obligation to mitigate its damages where shipper failed to pick up cargo) (<u>citing</u> <u>Ellerman</u>, 288 F.2d at 290).  The evidence at trial demonstrates that – once testing established that the spoiled tilapia would not contaminate other food items stored at USCS – USCS would have agreed to store the cargo for the entire August 2009 to March 2010 period at a cost of $4,390.  (Tr. 119-122)  There is no contrary evidence as to reasonable storage fees.

Given Crystal's unreasonable demand – for seven months – that Orient not dispose of the spoiled cargo, the Court finds that Orient is entitled to storage fees in the amount of $4,390.

## III.  <u>SPOLIATION</u>

Crystal seeks unspecified sanctions against Orient because of its failure to produce certain records reflecting, <u>inter alia</u>, the temperature inside the malfunctioning container between August 4, 2009 and August 6, 2009.  (Def. Supp. Findings of Fact ¶ 58)

> Where a party seeks sanctions based on spoliation of evidence, it must establish:
>
> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002).

While it is not clear why the container's temperature data recorder stopped recording temperature information on August 4, 2009, it is equally unclear what Orient would gain by tampering with the temperature data recorder or by failing to produce records for the period after August 4, 2009. Records produced by Orient and introduced at trial show the steadily rising temperature in the container between July 30 and August 4, 2009, when Orient attempted to deliver the cargo at USCS. This was the critical time period. The records produced by Orient and introduced at trial demonstrate that the refrigeration unit was not functioning properly and that the temperature inside the container was much higher than the bill of lading required. (Px 24) There is no evidence that Orient destroyed records "with a culpable state of mind," nor is there any reason to believe that Crystal suffered prejudice as a result of the failure to produce the records at issue. Crystal's claim for spoliation sanctions is therefore denied.

## IV.   ATTORNEYS' FEES

Both sides have moved for attorneys' fees. Orient relies on the bill of lading, which provides for an award of attorneys' fees where the shipper has breached its obligations under the bill of lading. (Px 2 at 13, ¶ 5) As discussed above, Crystal was entitled to reject delivery of the spoiled fish; accordingly, Orient has no right to attorneys' fees.

Crystal seeks attorneys' fees under general maritime law principles. "Generally, attorneys' fees awards in admiralty suits are discretionary and based on a finding of bad faith."

26

Karo Mumessillik Ve Dis Tiscaret Ltd. STI v. Napoli Chemicals KS,  No. 09 Civ. 3204(HB),

2009 WL 2365238, at *7 (S.D.N.Y. Aug. 3, 2009) (citing New York Marine & Gen. Ins. Co. v.

Tradeline (L.L.C.), 266 F.3d 112, 130 (2d Cir. 2001)).  To show bad faith, a party must offer

clear evidence that its adversary "commenced or conducted an action in bad faith, vexatiously,

wantonly, or for oppressive reasons."  Dow Chem. Pac., Ltd. v. Rascator Mar. S.A., 782 F.2d

329, 344 (2d Cir.1986).  In considering whether a party acted in bad faith, the inquiry is

"whether a reasonable attorney could have concluded that facts supporting the claim might be

established, not whether such facts actually had been established." Zerega Avenue Realty Corp.

v. Hornbeck Offshore Transportation, LLC., No. 04 Civ. 9651 (KNF), 2007 WL 4326110, at *1

(S.D.N.Y. Dec. 4, 2007) (citing Nemeroff , DDS v. Abelson, 620 F.2d 1078, 1088 (2d Cir.

1977).).  See One Beacon Ins. Co. v. Old Williamsburg Candle Corp., No. 03 Civ. 6901(LAK),

2006 WL 2623244, at *1 (S.D.N.Y. Sept. 13, 2006) (granting partial attorneys' fees where

carrier lacked any basis for disputing agency aspect of defense); Thypin Steel Co. v. Certain

Bills of Lading Issued for Cargo of 3017 Metric Tons, More or Less, of Hot Rolled Steel Plate,

No. 96 Civ. 2166(RPP), 2002 WL 31465791 (S.D.N.Y. Nov. 4, 2002) (attorneys' fees awarded

for defendants' bad faith in bill of lading transaction), aff'd in rel. part, 82 Fed. Appx. 738 (2d

Cir. 2003).  "[A]n award of fees under the bad faith exception will only be upheld where there is

'clear evidence' that the actions were 'without color' and were brought 'for reasons of

harassment or delay or for other improper purposes.'" Zim Israel Navigation Co., Ltd v. 3-D

Imports, Inc., 29 F. Supp.2d 186, 194 (S.D.N.Y., 1998) (quoting Dow Chem. Pac. Ltd., 782 F.2d

at 345) (internal citations omitted).

       Having heard the evidence at trial, the Court concludes that Orient acted in bad

faith to the extent that it contested liability.  While Orient's arguments regarding damages were

not entirely frivolous, it offered no colorable argument as to liability.[8]   There was never any dispute that the frozen tilapia was presented to Orient in good condition, that the refrigeration unit in Orient's container malfunctioned, and that, as a result, the cargo arrived at USCS on August 4, 2009 in a damaged condition.   Orient offered no explanation as to why it had not moved the frozen tilapia into a working container on August 1, 2009, when it discovered the malfunction.   Orient likewise did not explain why the fish was not transloaded on August 2.   And Orient provided no credible explanation as to why it refused to transload the fish on August 3, 2009, when it first notified Crystal of the malfunction and Crystal requested that the fish be transloaded into a working container.

Moreover, Orient's defense as to liability was pursued in the face of contemporaneous documents from Orient employees demonstrating that they understood that it was necessary that the tilapia be transloaded into a working container "ASAP."   Finally, all of the critical facts concerning liability were in Orient's possession at the outset of the suit.

Because Orient had no colorable defense to Crystal's counterclaim as to liability, the Court concludes that that defense was pursued in bad faith and for purposes of delay and vexatiousness.   Crystal's application for attorneys' fees is granted to the extent it is premised on Orient's challenge to Crystal's counterclaim as to liability.

---

[8]  Where food cargo arrives at its destination in a damaged condition, carriers commonly stipulate to liability.  See, e.g., Fortis, 320 F. Supp.2d 95 (liability conceded; damages disputed); Dessert Service, Inc. v. M/V Msc Jamie/Rafaela, 219 F. Supp.2d 504 (S.D.N.Y. 2002) (shipment of frozen desserts thawed during carriage; carrier stipulated to liability); Cargill,Inc., 404 F.Supp. 342 (cargo of creosote-contaminated molasses; carrier admitted liability).

## CONCLUSION

For the reasons stated above, judgment is to be entered in favor of (1) Orient on its claim for demurrage in the amount of $4,390; (2) Crystal on its counterclaim in the amount of $60,860. Each party is entitled to pre-judgment interest on its award, with interest to run from August 4, 2009.

Crystal will file a supplementary submission in connection with its application for attorneys' fees by February 17, 2012. Orient will file any opposition by February 24, 2012.

Dated: New York, New York
   February 10, 2012                           SO ORDERED:

                                               Paul G. Gardephe
                                               United States District Judge

29